Case number 22-3765, Kevin Hardwick v. 3M Company et al. All arguments not to exceed 30 minutes per side. Mr. Paul D. Clement for the appellants. Good morning, your honors, and may it please the court. Paul Clement for the appellant defendants, and I've endeavored to reserve five minutes for rebuttal. Very well. Your honors, the class certified here is truly extraordinary. It pushes well beyond the boundaries of Article III and Rule 23 in multiple dimensions and in ways that compound the other difficulties with the certified class. In order to get every Ohioan into the same class, plaintiff had to dilute the claimed common injury to a point where Article III problems abound. In order to make the class appear even minimally cohesive or indivisible, it asked for injunctive relief at odds with Rule 65 and the limits of a federal court's equity power. Even if every Ohioan or every American could benefit from further scientific study of PFAS, that would be a job for a legislative hearing, the Ohio EPA, or a Blue Ribbon Commission. Not for a federal court or a sprawling class action that seeks to convene a science panel to answer the threshold question in any case in Article III seeking injunctive relief, namely whether the named plaintiff or other 11 million class members have suffered a certainly impending injury. Now this is of course not the first time that a panel of this court has looked at this sprawling class action. In accepting this 23F appeal, the motions panel identified at least three problems with this class action. Each of those problems is fatal. Start with Article III. At the most basic level, this lawsuit seeks to convene a science panel to determine which class members suffer a certainly impending injury from exposure to some 5,000 or more substances. Can I re-characterize it and see what you think? So assume, and I know you dispute this, but just assume that it is a battery under state law, and we can discuss the propriety of that or not, but just assume for a second. And as a result of having PFAS in my system, or hard wick system, I suffer emotional distress. And to get, and I trace it, let's not discuss traceability yet, but just assume that 3M and DuPont, those two defendants combined made whatever the suppressant he uses or whatever he used. And the medical monitoring slash science panel, and we can discuss, I know you have differences with what those are, will alleviate my emotional distress because if you monitor to make sure I don't get cancer, let's assume it's medical monitoring, then it would alleviate my distress. Why wouldn't that be injury, why wouldn't that satisfy injury in fact? Well, your honor, I think by the time I've had to assume everything you've made me assume, we might be pretty close to having an action where there's Article III injury. But I sort of have to dispute this sort of at every stage, right? I mean, I'd start with the idea that I think to have a battery, you need to have a injury that is like an actual injury. And here, the level of injury in order to get everybody into the same class is defined at mere exposure. Let me ask this, when we're looking at standing, sort of what's the, how do we look at it? Do we look at it as if it's at the pleading stage or the summary judgment stage? How do we look at standing at this point, at the class certification? Yeah, I would say it's kind of halfway in between the pleading stage and summary judgment. But I do think you have to look at the standing inquiry in light of the complaint, the deposition, some of the expert testimony that's all come in to inform the rigorous analysis that's necessary at this stage of the class certification procedures. So I think there are problems here with standing on the complaint, but then I think the deposition here has only exacerbated those problems. Because, and they go not just to injury in fact, but to traceability. And you alluded to that, that we talk about that later. But in the deposition, Mr. Hardwick not only indicates that he wants the science panel to sort of figure out whether he has a real injury, but also conceded that he has no idea which one of these defendants is the source of his injury. And all of that then starts to kind of bleed over into the Rule 23 problems. The play points to Sutton, and we haven't overruled Sutton. So why wouldn't Sutton be enough to show there's injury here? Well, I think Sutton is factually distinguishable. I think it's also been overtaken by events in ways that would cause this court maybe not to overrule the result in that case, but to indicate that there are certain statements in the Sutton opinion that cannot be squared with the Clapper decision from the Supreme Court. But as to the actual holding in Sutton, there were allegations there that having the implant inside you materially increased the risk of certain specific conditions. And there's two that's specified in the opinion. And that's missing here. So, you know, that's alone in my mind sufficient to distinguish Sutton sort of on the facts. But on the law, the Sutton court in distinguishing a D.C. Circuit case specifically said that immediacy didn't matter. Now here, just to go back in part to my hypo, he does allege emotional distress, right, in his complaint, in a very sort of abstract way, but not in a way, I mean, you know, just to get back to your hypo for a second, I mean, you know, one thing to keep in mind, obviously, is that you need the appropriate Article III injury for each kind of relief you're seeking. So, you know, if somebody came into court and said, I was subjected to a lot of these chemicals, and I know exactly who supplied the chemicals, the maker of the thing that I particularly use, and I think I'm going to suffer emotional distress as a result of that, they could certainly get a damages action for retrospective relief. I think if they wanted to get injunctive relief, they would have to show and plead first and then show at some level of rigorous analysis that those emotional injuries were kind of certainly impending. And I don't think it's just enough to say, I'm worried about this thing, and I want a science panel to tell me how much I should be worried. What about the Northern District of Illinois cases that say, this is enough basically for injury in fact? Well, I think, you know, not every district court case has precedential value even in the district court, and I think, you know, to the extent those cases stand for those propositions, I would say those cases are wrongly decided. I'm sorry, you've finished your sentence. No, and I think there is an important distinction between sort of mere exposure and this kind of certainly impending injury. And I think part of the reason we're in the exposure category is that's the only way to get all these Ohioans in the same class action. If we just look at injury and not at redressability, not at traceability, I mean, why isn't battery a close analog to use the transunion term? I mean, you know, battery can be just an offensive touching or harmful touching. So, I mean, why isn't this, you know, sort of, you know, having, coming into contact with these compounds or whatever, why isn't that just for purposes of a cognizable harm something that works for them? So, I do want to get to the relationship to redressability and traceability, but I want to answer your question. And the way I want to answer your question is to say, you know, the key word there in a sense is harmful. And that is the common law analog. And I think at the point that you. Offensive is too. Right, fine, I'll take offensive. Reasonable decency, you know, person. But I think implicit in all of that is the notion that this is like the kind of touching that implicates you and your concerns in a way that differentiates you from other people. And I think if you try to conceive, I mean, you know, all of us probably take in some gamma rays. All of us take in some carbon dioxide. All of us take in certain things that we all share in common. And just because those are inside our system to analogize those to a common law battery, I think kind of ignores the, you know, you know, I don't know of any common law battery that everybody in the state could pursue simultaneously. And I think if you start going in that direction, you sort of lose the common law analogy and the whole point for why TransUnion in other cases kind of asked for that. Which is we want something with some roots in common law that sort of gives us a concrete and particularized injury that distinguishes us from everybody else. Because at the end of the day, if it's a shared injury and we all have like, you know, I mean, you know, or a shared exposure. I should choose my words very carefully. But if it's a shared exposure that we all have in common, then why do we need an Article III court? That's a perfect subject for legislative hearings, the Ohio EPA. I mean, you know, that's how we deal with things that we all share in common in this country. But it's a particularized grievance that gets you into Article III court. You're not arguing generalized grievance per se, are you? Just by analogy for why the battery sort of analog doesn't really work here. Okay. And, you know, I should be mindful of wanting to talk about Rule 23 a bit and wanting to talk about redressability and traceability. Those problems are serious here and, you know, I'll talk about traceability in particular. Because they say that these 10 manufacturers manufactured and distributed things that had PFAS in Ohio, the plaintiff is from Ohio. Therefore, maybe at the pleading stage they're saying we ought to infer that some of the PFAS in his bloodstream came from these people. I mean, what's your take on that? My take on that is that's not good enough at the pleading stage and we're no longer at the pleading stage and we have a deposition where Mr. Hardwick has essentially conceded that he doesn't know which of these defendants is the source of the PFAS. And I think there's two important points to keep in mind here. One is even when the common law starts expanding notions and we all went to law school and heard those hypos about the three shooters and the one injury. Like, you still have to sue the three shooters. You can't just sue two of the shooters, call it a day, even though you admit that, you know, somebody else might have been responsible for this injury. So that's one of the problems here. The second problem here, though, and I think it's, you know, kind of gets into the Rule 23 issues, is there's just kind of a huge rules enabling act problem here. Because if I went into court as an individual, I would logically sue the people that I thought had something to do with the PFAS I came in contact with. Why not the inventor? Isn't that 3M in this instance? I don't think I would sue the inventor. I mean, and I do think what I would do, and I don't know that you can say that anyone is the inventor of these 5,000 different substances. And so I don't think that analogy quite works. But I still think, you know, if I were a firefighter and I came with this foam, I'd figure out, like, okay, I sold this foam or whatever on behalf of a company, I'd sue them. I'd look at the can of foam. I'd sue whosever name was on the can of the foam. From there, I'd do a little bit of research, sue whoever kind of ultimately produced that. And then once I got into court with all of that, I'd have traceability and maybe I'd get some discovery and figure out I need to add two or three defendants. But that's the way it works in an individual case. And to say, well, because I'm suing as a class action, I'm not going to go that route. And I'm just going to sue, like, the 10 top manufacturers that nobody thinks make up to 100%. That's exactly what you're not supposed to do under the Rules Enabling Act in class action. And then that problem, and I should say a word about redressability, which is, you know, if you get to the science panel from the injury in your blood, you have a huge redressability problem. Because the science panel doesn't redress that injury. And the science panel is problematic on about six other levels that I probably should best talk about under Rule 23. So in the Rule 23, when we get to that analysis, again, if you conceptualize what's supposed to happen in a B2 class action, it's basically supposed to be a situation where if I sued as an individual, I would get an injunction that would perforce, that's Justice Scalia's word from Walmart, benefit everybody in a class. So if I sued a school to change their admissions policy, if I did that in an individual suit and got, you know, the University of Michigan to change their admissions policy, it would benefit everybody in a class of applicants to the University of Michigan. But why wouldn't this benefit everyone in the class if they knew the effects of PFAS? Because this is your classic divisible injunction, if you will, or divisible equitable relief. If I'm sitting, you know, in a different part of the state and I'm near a plant, what I care about is not studying everything under the sun, 5,000 different PFAS. I want to study that particular PFAS that's coming from that particular factory. If I'm somebody that's got a particular disease right now, I don't really want to be part of a class that's studying an abstract. I mean, couldn't you piecemeal every class that way in some sense? No. I mean, I don't think you can piecemeal a proper B2 class in that respect. If the requirements of B2, as we learned from Walmart, is the relief is supposed to be indivisible, then you don't have a situation like this where the science panel is A, going to study a bunch of stuff that most of the class members don't care about. B, if the science panel here is anything like the C8 science panel, which is obviously distinguishable because it's the product of a settlement and all of that, but the results of the C8 panel, as you learned from the Sixth Circuit opinion, 50 of the 56 diseases they studied, they found no link. So for purposes of this class, most of the people in the class, if that's a guide, are going to be disappointed by the results here. And then not everybody in the class is going to get medical monitoring. Only a subset of the class, a divisible subset of the class, is going to get medical monitoring. And then I would venture to guess that a good chunk of the people even in that class aren't going to particularly want medical monitoring. It's the last thing they want. It's going to go to the doctor four extra times a year and get their blood drawn? Thank you, no. So this just seems like when you look at the injunctive relief here, it is absolutely the wrong kind of injunctive relief for B2. And I think you get there by applying a cohesion requirement, but I think you get there by requiring just like the basic lessons of Walmart, which says, you know, the reason we don't have a predominance inquiry and a superiority inquiry, and we can talk if we want about whether we have an ascertainability requirement, but the reason we don't have some of those things in a B2 is because if you have a proper B2, like all of those things are satisfied a fortiori. And that's why they're a mandatory class. That's why there's no opt-out right. And that just isn't true of this kind of science panel on the way to a medical monitoring class action. And of course, the fact that it's like a science panel on the way to medical monitoring is another problem that we have here with this class, which is the science panel, if we can start there. And, you know, we can, like the parties have this back and forth about whether it's mostly a science panel or mostly medical monitoring. If you look at the complaint, it seems pretty clear that it's a science panel on the way to medical monitoring for at least some subset of the class. So the science panel is the first step. It doesn't say medical monitoring in the complaint. Not in the claim for relief. In one place earlier in the complaint, it says the words medical monitoring, but there it's talking about the possibility of medical monitoring or even a damages action for some part of the class that gets the results they want out of the science panel. And the science panel, I mean, there's the obvious fact that if you told the framers about a science panel, they would say, oh, yeah, that's right from the court of chancery. No, it's completely unheard of from a 1789 equitability. What's that? But they're quite different. And that really gets to, like, if you almost, in a sense, I think the science panel is very close to what you had in Grupo Mexicano, which is it's not even, like, a normal mode of final injunctive relief. So I think I can make a good case that busing is just an analog to basically telling the defendant, fix the problem. And the way you fix that particular problem is by busing. But this is study the problem. And, you know, and it doesn't work as a final injunction. I mean, if it. The plaintiff says in their brief on Grupo that Justice Scalia in note three pretty clearly set aside whether or not the state. And that was post-guaranteed trust, right? He says, he cites guaranteed trust. But in footnote three he says, I'm not deciding whether state court remedies are permissible. Sure. But he does that in the context of a case that's, like, there, like, with diversity, right? So that, you know, Grupo Mexicano is like a state law case. So when he reserves that question, I mean, you know, that's just saying it's not properly preserved here. You didn't make that argument. It's forfeited. But I don't read any negative pregnant there that the result in this case would be different if they preserved that argument. No, I'm not saying that. But why wouldn't he just say, I get you can say that. He could just as easily have said, look, under guaranteed trust, right, this isn't what we do when we look at equity. We don't look at what the states provide. We look back at the high court. Because those are what the two cases are saying, right? I mean, you tell me, Your Honor, when you're looking at a forfeited, lousy argument, do you say it's lousy or do you say it's forfeited? I would imagine you do, you know, one or the other. That's not my mood, I guess. Yeah, right. No, exactly. Exactly. So I think Justice Scalia's mood that morning was to say that's forfeited. I'm not going to go there. But I do think if you put Grupo Mexicano and guaranteed trust together, they tell you pretty clearly that this is a rule that applies in diversity cases. And as I said, there's a real parallel here because, you know, the specific problem with the equitable relief there was it was kind of different from the relief you could get at the end of the case. And that almost has to be true of the science panel, right? Because the alternative, I mean, if they really want a science panel and nothing else as the remedy for this class, boy, would I want to opt out of this class if I were in this class. Because that means, you know, and this class covers people in Ohio with actual injuries who are suing my clients for damages like right now. And the idea that if this case goes to judgment first, they would get a science panel and then be raced to the cottage board out of their damages claim would be incredibly unfair. So unfair that I don't think I could win that argument to be candid, but only because that just shows that this whole enterprise is kind of flawed from the outset. And this is just not the way that you can proceed. Did you all raise this sort of group O argument before the district court? Yes, we did. And, you know, provide a site for that. But we've raised this throughout. We've also raised concerns about, you know, the nature of this relief being sort of, you know, not consistent with Wal-Mart and, you know, and obviously we've raised the cohesion arguments. And Judge Sargas said, you know, I don't think there's a cohesion requirement, but I also think there's cohesion here. You know, I mean, and just to speak to that issue for a moment, I do think if there is a cohesion requirement, I do think there should be a cohesion requirement. This Court has said as much in an unpublished opinion in every circuit, but the Ninth has said there's a cohesion requirement under B-2. If there is one, this fails that going away. And in terms of, you know, Judge Mathis, you asked kind of what's the record at this stage. I think one thing that's pretty clear at this class certification stage is you would look to the expert reports that are in the record. Here you have five expert reports from the defendants. The plaintiffs did not offer a counter-expert. The expert reports for the defendants that are in the record make clear that, you know, when you're talking about a class that they define themselves as PFOA plus any one PFAS, there's somewhere between 5,000 and 10,000, depending on who you ask. But our experts say over 5,000 different PFASs. They all operate in different ways. They have different paths in which they might get into the human body. They have different ways of getting out of the human body. They have different properties, kind of radically different properties. I mean, it's just a trivial illustration that, like, you know, you change one molecule and the boiling point changes by like 100 degrees. All of that is kind of surveyed in our experts, which just shows that there's just no cohesion to this. I mean, and as I say, I can't predict the future, but if you imagine the science panel going forward, I can't imagine, based on the record that you have before you, that the answer from the science panel is going to be, yeah, that's right. If you have PFOA plus any one of these 5,000 different substances, that creates a unitary injury for everybody in the class that has the exact, you know, this following risk profile. So everybody in the class is going to need the exact same medical monitor. Let me get, well, please go ahead. No, I mean, that has the probability of an asteroid sort of, you know, hitting this courtroom right this minute if you look at the record that was assembled before the district court. Just to ask you a technical question about the showing that the plaintiffs need to make as to standing under Lujan, you know, like, you know, which stage are we at? I mean, so we're not at the summary judgment stage quite yet. There's been some discovery, but we do have class certification, which kind of, you know, maybe under Walmart gets us toward, you know, that sort of like intermediate zone that, you know, in terms of the showing. So, I mean, if you could just describe a little more precisely what showing you think is necessary at this stage of the case being the certification stage and what you think the authority is for whatever you say. Sure. So, I mean, my theory ultimately is just kind of Lujan. I mean, there are some cases I think we cite in our brief, but I think this flows directly from Lujan. And I think you make the standing determination based on everything that's properly before you for purposes of the rigorous analysis that's necessary for Rule 23. Now, that's not going to be the exact same set of materials in every case. I mean, there are going to be some cases where there aren't expert reports at the Rule 23 stage. In any contested Rule 23 certification, I would suspect there are going to be expert reports and things like that, and you would take them into account. If the expert reports are conflicting, I think you probably would give the plaintiff the benefit of the doubt in a case like this where you have expert reports on one side, not the other. You would take those into account. So, even if the pleading stage, you were willing to entertain the possibility that all 5,000 PFAS acted exactly the same. I don't think you can any longer take that into account at this stage of the proceeding. Yes, so anything that the court would take into account for its rigorous analysis under Rule 23 ought to be taken into account for the standing determination. There's no reason to ignore it for one purpose and use it for another. That would be exactly our position. I think that flows directly from Lujan. And that's why, you know, we think the standing problems, for example, are evident on the face of the complaint. But then if, you know, at this stage you have the deposition of Mr. Hardwick, and I don't think you can ignore what he said in his deposition. I don't think you can ignore the expert reports. And I think all of that underscores that, you know, we kind of have the triple threat of Article 3 problems here in terms of injury and fact, traceability and redressability. And then the standing issues are evident on the face of the complaint. Is that all three factors, meaning injury and fact, traceability and redressability? Have they not played any of those or just, I guess, a couple of them? I would take the position, and we took the position at the motion to dismiss stage, that they went 0 for 3 even on the complaint. But I do think kind of every one of those problems has gotten more acute based on some combination of Mr. Hardwick's deposition and the expert reports here. You know, just the last thing I'll say, because it's the third thing that the motions panel talked about. But the standing problems talked about essentially the Rule 23 cohesion commonality problems. But it also talked about class definition as being a potential problem here. I think the better answer is you need ascertainability if you have a mandatory B2 class action. But even putting ascertainability aside, because there's a big difference to say nobody can come on the street and saying we're going to provide medical monitoring for an identified group of people. It seems in the latter case, if that's otherwise proper, you would need to have an ascertainable class. But I would also say there's a problem here that we can't even define in class. Thank you. Very well. You'll have your rebuttal. Hear from Mr. Herzig. Good morning, Your Honors. Aaron Herzig for Apo Lee Kevin Hardwick and the class. May it please the Court. I think the argument of my colleague points out exactly why this Court needs to affirm the examples that he gives of the types of injuries for the cases that he describes, CO2 gamma rays, are exactly the opposite of what has occurred here. PFOA, PFOS, all the PFAS chemicals do not exist in nature. There is no background. Can you start with the standard and then move into that? So what's your response to his argument that we should apply, in essence, the class certification standard at this stage? Why wouldn't we do that? It makes sense to me that we would. What we just talked about. Yes, Your Honors. Look, I think the law says that you don't have to start there, that you can rely on the properly pleaded facts. I don't think it says that. But it doesn't speak specifically to this. But if we're taking, if the District Court is taking certain materials into account for purposes of its rigorous analysis under Rule 23, I mean, why would Lujan sort of support ignoring those materials for purposes of standing? I don't think it needs to, Your Honors. I'm not actually concerned about that in this case, because I think we meet the standard clearly under the District Court's order, under the evidence that it brought. So I don't think... Do you agree with the standard? I certainly can live with the standard. I don't think this is a case where you need to make new law in that area or in any particular area. What we have is really quite... Go ahead. What we have is quite simple from some of your questions at the beginning. Okay. That was your sentence. I want to ask you a question. You know, sometimes the commas never end when I say that. I just, I want to make sure I understand what you're arguing and what you might not be arguing. So, you know, you, with respect to injury in fact, you're pointing to the presence of PFAS .05 parts per trillion, I guess, in your client's blood. And you're pointing to some risk of future disease, basically, as a result of that. Is that right? Yes. And so are you, when you argue that he has an injury, is that each of those standing alone or is it in combination or what is it? Your Honor, we would argue that he, the class, 99% of the country have already been injured. The question is what we don't know. I mean, you have two components. I mean, two things that you point to as... supporting a concrete injury. Do we analyze those in combination? Is that what you're arguing to us? Are you arguing that each stands on its own bottom as an injury? I just want to understand your argument to make sure we think about whatever that is carefully. I think we win with either. You can look at either, but we have the combination here. Okay, so it's all of the above? Yes, Your Honor. Okay, that's fine. I just want to make sure I get it right. And I think that's fair in this context. How is it certainly impending? That's, I mean, if we're looking at future risk alone, I mean, your own pleadings say you don't know what the risk is. And so how in the world can that be certainly impending if we're just looking at the piece about the future risk? So certainly impending from the Clapper case, I think, is the wrong place to look. Well, take your pick of Supreme Court cases in the last year that, ten years, I'd say certainly impending.  You don't think that's a standard that applies to a claim for risk of future harm in this case? Not in a medical monitoring context, not in the context of these facts. What's your authority for that? I mean, Clapper and TransUnion and the rest, I mean, as Judge Kefla just said, make pretty clear that that applies across the board. It's Article III. So two things, Your Honor. First of all, as you point out, Sutton is, in fact, the precedential law here and should be valid. Sutton is completely irreconcilable with a certainly impending standard. I'll just put my cards on the table there. I mean, I think if you want to talk about Sutton, you want to rely on that. But I would suggest that ship is on its way to the bottom. And it's just not very helpful with what we're trying to figure out here. Give me a moment to explain why I think that's incorrect. Okay. I mean, go ahead. You've looked at that in the Baker Chevron case. I understand where that's coming from. Clapper relies for certainly impending injury on an Eighth Amendment death penalty case, Whitmore versus Arkansas. All of the cases that it talks about are in the context of figuring out whether any American in the structure of our government has a lawsuit as opposed to any other American. It's essentially the idea of kind of taxpayer standing. In all the cases that are cited there, and then when you look at TransUnion or the other cases that deal with us, they're all dealing with a question of is this injury one that anyone can bring because they're simply citizens of the United States. We have something very different here. Certainly impending injury I get makes sense there. We've had that law for a long time. In a way, I think Clapper relies on Whitmore starts there. It's not new in Clapper. Expanding it beyond the context of looking at whether one taxpayer has an injury versus any taxpayer I think is incorrect, especially in these injury cases. Clapper just does not qualify its holdings and its analysis in the terms you're talking about. Valley Forge Cushion is basically a taxpayer case, you know. I get that. But, I mean, they give it a new lease on life here. The assumption that if respondents have no standing to sue, no one would have standing is not a reason to find standing. I mean, they take it out. It's no longer a taxpayer proposition. Now you're stuck with it. So that's a different argument. But, I mean, they're saying here that the plaintiff's fears in Clapper that their communications would be intercepted is speculative. And, therefore, it's not certainly impending. Your fears about disease is beyond speculative because you don't know anything about the degree of risk. I mean, isn't that just obviously not certainly impending? I mean, just to clean up the case a little bit here. So, Your Honor, let me, there were kind of two parts to that. Yeah, I'm sorry. No, no, I'm just going to answer, do my best to answer them both. The first is that the Clapper, the FISA case, that really is exactly in the realm of what we've always talked about. If there is a new criminal law that is passed by a municipality, can I immediately seek to enjoin it or do I have to wait until I've been arrested? That's essentially what Clapper is. And I think to expand it to its most capacious reading based on those facts and based on the history of the cases that are cited there, I think is incorrect. I don't think that's what Clapper says. And I don't think you take a Supreme Court precedent based on specific facts with that kind of history and say, yes, it now applies to every conceivable context. In terms of the injury, I do appreciate the ability to get back to that. What we have here are, we know who manufactured the chemical. We believe that's, that we've sued everyone who manufactured the chemical. So you sued 10, right? Yes. And I mean, you know, it's a different topic. But on traceability, our decision in Fox seems like a very troublesome decision for you here. I mean, in Fox, you probably know, the plaintiff sues, I think it was 26 counties. Only one county had taken the equity in his home by way of this foreclosure. And in Fox, we said that he lacked standing to sue the 25 that had not taken his equity. But at least he knew one that did take his, that harmed him. Here, it seems like you don't know anybody. I mean, how, where in your complaint or in the record do you plausibly allege facts that would support a determination that a particular defendant put, or is responsible for, particular PFAS in his body? One very quick note on Clapper. Check out footnote 5 supports what I'm saying in Clapper. So when you're looking back at that case, Fox, which is authority that the other side supplemented in the 28J, is very different, I think. I was on the panel, so tell me how. Well, because one county took the action, he knew what that one county was, and then he sought to represent a whole lot of people that were affected by other counties. Right. But the point is, he knew one at least. Yes. And why isn't it true that you know zero? Well, no, I think it's the opposite, Your Honor. We know all. But it has to be that they harmed your client. Not just harmed people in gross, but your client. So how do you know that all, where are the facts in the complaint or elsewhere in the record, particular facts, not just talking, particular facts that support the conclusion that each of these ten defendants is responsible for PFAS in your client's bloodstream? My client seeks to represent a class of everyone who has PFAS, PFOA, PFOS, PFAS. That answer is a non-starter under Fox. Forget about the class. Let's say it's just your client who has brought this suit, and I'm asking this question. What's, and I'm saying, I don't see traceability to anybody here. Where are the particular facts in the record that support a determination that each of these defendants is responsible for PFAS in your client's bloodstream? My answer to that question is the logical conclusion to it in this context. Is that if enough people manufacture a toxin and contaminate us without our consent and hide the fact that they have done that from the people and the government, then they can get away with it. That would be the logical conclusion. That sounds like Valley Forge Christian, you know. Go ahead. No. Well, I was going to say that. I mean, that was Mr. Clement's point, right? Then go to the EPA, go to the Ohio EPA, go to, it seems like what this case is about is the legislature and the executive branch haven't given you the relief you sought, so you're coming to us to ask us to remedy that. But that's much beyond what Article III courts do, right? You have to, the example that Mr. Clement used, I would use a different example, but let's just use his, which is you identify who put the chemical in your body, you go through, you figure, you look at the can, you look at everything, you sue the people in the chain. That makes sense. But just suing ten of thousands to try and figure it out without even knowing if any of them had something, it seems beyond 3M and DuPont, I don't even know how you get the others in on this record. So take the analogy of the three shooter problem. You sue all three shooters. You don't have to sue the gun manufacturer. You don't have to sue the manufacturer. Okay, but you know the bullet came from one of them. Well, right, but you don't have to figure out the entire chain of events. What is conflated here by defendants is the idea that. Well, how did you pick at least ten? That's what I'm getting to, Your Honor. They manufactured it. We have started at the top of the chain. They're not the only ones. I mean, there are Chinese manufacturers. There's all kinds of manufacturers. They are the ten manufacturers that we allege have. I know that is. But they manufacture what, the C8? Is that specifically what they manufacture or they just manufacture PFAS? PFOA and 3M in particular manufactured PFOS, a patented chemical. But the class has to have C8 plus one other. So we have a plus one other. Why is it these ten defendants? Because they all were involved in the manufacture of all of those chemicals. Well, couldn't they, if they're 5,000, couldn't they throw it at a dart board and pick the one I hit and say, well, they're involved? Well, a couple things. No, I don't think so. Second, at what stage are we in this case? The evidence before you is that these ten manufacturers injured these plaintiffs. Well, these plaintiffs, okay, I'm going to be a little bit like a dog with a bone on this because the question I asked you earlier, as far as I'm concerned, is a very consequential question. Where in the record is anything that supports plausibly, particular facts, a determination that these ten defendants, each of them, not collectively, individually, each of them is responsible for PFAS in your client's bloodstream? You haven't pointed me to anything in the record, so I'm just going to ask it one more time, because this is about traceability. I mean, and not a legal argument, just where, this is a factual question. Where in the record? So, the record is long as to- I'm willing to find it. As to the injury and the effects here. I candidly think the court is looking at this the wrong way. Well, why don't you just answer my question. Is there any, just yes or no, is there anything in the record you can point me to that supports the question I asked you? So, I do not know yet. Okay, that seems to be the problem with this case. Except that it's- That the case got filed before the research was done. I mean, the case got filed first, and we're sort of figuring it out later, it appears, unless I'm misunderstanding. So, a couple answers to that. And I'll be quiet, Matt. It's your honor's court. Including the answer on article three, and whether the judiciary can have no role here. The case that has been described by defendants is a personal injury B3 case, where you do trace all of these things. We are looking at something different. We are looking at the manufacturers of these chemicals. They have put it out into the world. They, for decades, didn't test it. Then they did test it. We get what they did, Ron. Look, I have a lot of empathy for that. But the problem is, which Judge Ketledge keeps bringing up, which is the thing we're used to doing, the thing courts do well, is we look at record, we say, okay, one of these guys shot your client. We can't even determine that here, because there's nothing in the record showing that. So, how do you get- It really genuinely seems to us, when you look through it, that you threw at a dartboard and picked eight of them. I'll just set 3M and DuPont aside, because I'll agree there's stuff in the record. I'm not saying it's linked to the plaintiffs, but the other eight just seem like completely like I could have picked anyone. Well, that isn't quite true, Ron. I mean, the fact is, these are the same defendants in the AFFF phone cases. They're the same defendants that are being sued across the country now for PFOA and other PFOS. But, I guess, this may be something that you're not used to, but it's because we're not used to it. When in the history of our country, or going back to the English Chancery Court, has an entire industry poisoned an entire population? Tobacco industry, how about that? I mean, the smokers and the second hand? I mean, if the mere presence of some man-made or some toxin, I shouldn't use that word, something in one's blood that is the result of human activity. If the mere presence of even non-detectable, apparently in this case quantities, of something that is there because of human activity, if that's an injury, I mean, what's the limiting principle for that? I mean, if you walk down the streets of Manhattan or New Orleans, you're involuntarily going to be exposed to all kinds of marijuana smoke these days. I mean, could, and I hate it. So, could I sue the marijuana, you know, 10 of the big ones or something, dispensaries, and say, because of your activity, I've got this stuff in my body, and I don't know what's going to happen, but I want to find out. Why couldn't I bring that, why isn't that a cognizable injury under your theory here? Well, if I can, I think it would help for me to be able to describe what actually happened here. But just give me my answer to that question, because I'm curious. Well, could you sue the... That's not my case, is not a good answer to a hypothetical question. So, what's... I just think the hypothetical... Can I sue the pot manufacturers? Well, why? It sounds similar. That's maybe what we're missing. I'm asking you a hypo. Yes. And you've got to answer the hypo. Right, and the difference isn't exactly what we have here. But I'm not asking about the difference. I'm asking what happens if I try to sue the pot companies. Do I have an injury? Because I breathed in smoke that they're responsible for? Just do I have an injury? Not about whether it's like this case. No, I don't think you have an injury. And why is that? Because you're able to avoid it, in part, the person... No, I'm not. Unless you tell me to stay out of New York City, no, I'm not. Really. No, I... I would think the answer is there is an injury. Then, you know, whether it's traceable or redressable is the question. But I think in the hypo, it seems like there is that injury effect. There certainly are cases where people have sued over having someone blow smoke intentionally in their face. And they sue for battery. But they sue the individual for doing that intentionally. So tell us why your case is different. You keep trying to get there. Go ahead. Because it is... Marijuana, by the way, also naturally occurring, for what it's worth. This is the only chemical... So offensive. It works with your battery. No disagreement. Please tell the people that run my garage to prevent people from smoking in the garage. What you have in this context is a chemical with no background traceability. Because it did not exist until these manufacturers made it. These are the 10 U.S. manufacturers. That's a lot of chemicals. And we're after the Industrial Revolution. So that's going to be true of some things. It's not as far as I've seen in any case or the record. The record evidence that we have, and look, our expert reports are 164 and 165 in this record. The C8 panel, the C8 science panel, the C8 medical panel. We have a ton of evidence on our side. And Judge Sargas, who has dealt with this for a decade and is a thoughtful judge who is probably a leading expert at this point on these chemicals, had a thorough record before him to understand and adjudicate all of this. But an entire industry grows up, creates this chemical, disperses it into the world. It gets into all of us where it persists and accumulates. And we know from the C8 science panel, we know from the National Academies study, we know from ATSDR. Why shouldn't the executive branch handle this? That's what agencies do. They can investigate it. They can put together the science panel. They can figure out if this is going to have any impact on every American, according to you. And then from there, if you can figure out who put it in you, you can file suit against them. So a number of problems with that, Your Honor. First of all, just because they can doesn't mean that the judicial branch can't. In fact, there's plenty of commentary on the fact that class actions are and can be a much more efficient way to regulate than to expand the government. Professor Fitzpatrick has a whole book about that. The other piece you run into, though, is exactly the timing problem you're talking about. We know that we all have it in us. We know that there are links to serious disease, kidney cancer, thyroid disease, testicular cancer, preeclampsia for pregnant women, and on and on. But there's no evidence right now. There's no evidence that Hardwick and people with his level in him will get any of those. That's what we need a science panel to understand. Well, you know, normally injunctions force people to do things they otherwise wouldn't do. And this, the injunction you're seeking, is very strange in that respect because I'm sure there are plenty of scientists who would be delighted to research this as much as you or anybody else would like. And so it's just a matter of who pays them. So this isn't like a normal injunction where, you know, you're forcing, you know, somebody to do something that absent a court order they are not going to do. Here we've got a bunch of scientists. And so, I mean, this seems just like a cost-shifting mechanism that you're trying to obtain here rather than a more traditional injunction. I agree except the opposite, right? Having not studied it and then having studied it and hid it from the very executive branch that Judge Thapar would like to investigate and hiding it from the public. It is only when we finally file suit in 1999 that the judicial branch allows us to bring to light what these chemicals really do to people. The judiciary has an important role here. If we don't know, I go back to the initial question, which is how is it certainly impending or how is it even to use your language from footnote five, a substantial risk? So may I finish answering Judge Katz? Let's real quick. The cost-shifting is exactly the opposite. What defendants want is to socialize the costs of what they should have done from the beginning, which is study a toxic chemical that they were going to disperse into the world and find out what it did to humans first. They want to socialize that cost, whether it's through another branch of government or other scientists who are interested in it across all of us instead of what we should do, what courts traditionally do, is put the costs with the people who caused the harm. And that is what we're asking for here. And so. Okay, that's a good answer. So you can, that's fine. Why is it even a substantial, to use, and the Supreme Court says we're not sure that that's any different than clearly impending, but why is it a substantial risk if we don't even know? Which case is this? This is Clapper, footnote five. Sorry, why, I don't, why, I don't know, because, why, I don't know. No, at point zero five, we need a science panel to tell us if anything's going to happen to us. So we don't know if it's a substantial risk or clearly impending. In other words, this goes back to Judge Ketledge's point, it seems premature to us. I think it goes back to your original hypothetical, Your Honor, from the beginning of argument, which is Mr. Hardwick and the class sit here today with a toxin in their bodies that they didn't consent to, and we know it causes the increased risk of disease. We know that from the C8 science panel. We know that from the C8 medical. Well, the C8 science panel is just PFAS, not FAS, right? PFOA, and our class. Whatever, it's a different, it's a different thing, right? Well, it's a different form of the thing. So those can make, I mean, we don't know that this is exactly the same, right? It's a different genus, really, and there's like 5,000 species within, it sounds like. So again, well, yes and. PFOA, our class is PFOA, and at least one other PFAS. That's almost always going to at least be PFOS. So what we know today from the C8 science panel and the C8 medical panel is one, anyone with PFOA in their blood has an increased risk of kidney cancer, testicular cancer, and the list. They had, I thought they had like 10,000 at the time, because that was all related to DuPont, right? And we knew who the defendant was. We knew who put it in the water and everything else, and in that case, it was a great multiple of what it is here. So first of all, those were water levels versus what we're talking about are blood levels. And if you're asking about the numerical value, water levels versus blood levels. Second of all, yes, like in the Sullivan case or the Benoit case, in that case, there was a direct link between one manufacturer and that particular water source in Parkersburg. But that doesn't mean that we can't, and that this court can't help people that have been injured remedy the injury as to all of the manufacturers. In fact, this is the logical next step in that chain. We know PFOA causes increased risk of disease and that we all have it. The question, and some scientists are starting to answer this, the National Academy study that we cite on page 50 of our brief that studies it and that actually has a medical monitoring style plan. How do you respond to sort of the group of argument that this sort of medical monitoring science panel wasn't something that would have been in place under the English chance recorder? Thanks, Your Honor. I think a couple of answers to that. First of all, the harm that we're talking about didn't exist in 1789 for anyone to be able to come up with a remedy for it. But the types of harms that did exist, property harms, damming up the water supply, things like that, you can get an injunction to stop people from doing that. But let's talk, you know, medicine, the argument that defendants make in their brief is essentially medicine didn't exist in 1789. Why wouldn't the proper injunction be if it was harming you to stop the production of it? Well, they have stopped the production of it. I thought they weren't sent until 25. They are in the process, many of them are in the process of stopping production of certain chemicals. They also are continuing to manufacture new chemicals under like the Gen 8 labels and things like that. And the problem is it has been released into the environment and into all of us where it persists and builds up over time. So the harm that we have now doesn't, Mr. Hardwick's harm doesn't end merely because people stopped manufacturing it. It exists in the world today. It is accumulating and persisting. We can get all that. And leading, well, and leading to serious disease. I mean, what's the analog in traditional equitable relief? I mean, you know, Grupo says it's sort of court of chancery at that time. It's got to sort of fit within some type of thing they did. This is basically we want, you want an injunction to have some experts study something. That's fair, isn't it? That is the beginning of what we want. Right. That's what is in front of us. So tell me how that fits into the sort of thing that equity courts did in the late 18th century. And it doesn't have to, you know, just by analogy, obviously. Right. Well, I mean, we point out the various forms of trust that a judge could impose at the time. As I mentioned, you know, if you dam the water supply of an area and affected everyone around you, they could order you to take down that dam. Yeah, and that's a classic injunction, like I was talking about. They won't do it unless you order it. That's, I mean, but that has nothing to do with studying something. It's like we need to figure something out, you know. Yes. I mean, did courts ever order, like, you know, let's understand more about sort of the movement of the celestial bodies or anything, any study type stuff? Are you aware of any precedent for that? So I'm. That's okay. You can answer. But the answer is that there hasn't been an injury like this before. So, no, we don't have to have it. We don't have to have. But that's usually where legislation comes in, you know. When the law, that's, I'm sorry, I'm mumbling. When the law hasn't evolved to a certain point, sometimes that's where legislation comes in. It can, Your Honor. That is a possibility. Again, I don't think that just because there can be legislation, the judiciary vacates the scene. Yeah, the group, you know, put some limits on what we can do. Let me just see if my colleagues have any more questions. Yeah, real quickly. I know you want us to rely on Sutton for the injury effect. I just want you to explain why we can't. So we have Whitmore in 1990 Supreme Court case that talks about certainly impending. Then you have Sutton in 2005. Then we have Clapper 2013 sliced back to Whitmore and some other cases after that that talks about the certainly impending. So explain why we can rely on Sutton based on what's happened since. I would argue it's not just that you can rely on, but it is in fact right now binding precedent because it's exactly like this case, right? An implant causes the potential for a future injury and we're going to monitor people to make sure they know what that injury is. Clapper to me does not, like I mentioned footnote five, but in general Clapper when you really look back at what the court was doing there, Clapper is simply saying that when the question is every American by dint of simply being an American versus one American, does that one American have a special right to sue? And the answer there is no, not without a clearly impending injury. We have something very different here. We have actual injury from these chemicals being in our body and the harms that we know that they cause. So I think it's incorrect for courts to import Clapper's clearly impending into cases beyond the statutory type cases that Clapper relied on and that Clapper was. I want to just give you a, briefly to talk about cohesiveness, whether that applies in the B2 class. I just want to give you a quick opportunity to discuss that. Sure. We don't think it does. I think we meet it easily though because we have one injury which is that there's the PFOA and one other PFAS in the blood and that the remedy is common to everybody because we'll study it and then have a medical panel with a menu of options. So, so, so. You don't think it applies. Well, obviously a number of people have adopted it, we've discussed it, so why don't you think cohesiveness applies? Sure. So cohesiveness, your honor, has not been adopted by this court. It is not in the text of the rule. The way it has come up is by judges interpolating within the rule that there is this cohesiveness requirement. We don't think it should be applied to B2 as a textual matter, but even if the court decided to do that, and I don't think this is the right case for something like that given the facts, but even if you were to move to cohesiveness, we clearly have it in this case. Okay. Last questions? Really? Okay. He's used to being a DJ, the only one up here. All right, I have one last question for you, okay, which is if we say that the presence of this PFAS stuff in your client's bloodstream is a harm analogous to the harm caused by battery, just explain to me again how that injury, that particular injury, is remedied by the science panel. I'm getting at redressability here. So in a typical battery, I know I've been injured because I've been cut or punched or something like that. Here, I have chemicals in my blood that cause a specific number of diseases and perhaps more depending on what we learn, and so the redressability starts with in fact understanding that, and if I could get back briefly to the question of are we too early. The concern is that defendants want to say it's both too early and then later on they will say, oh, it's too late. What we have is the stuff in our blood and we know what it causes, and in the Abbott case, the personal injury case that this court affirmed a few months ago and that we cite, the defendants argued statute of limitations because the plaintiff knew that they had it in their blood and knew that there was the risk of injury at that point. What was the thing in the blood there? PFOA. That was one of the personal injury PFOA cases. I'll look that up. Okay. Thank you, Your Honors. Thank you. I appreciate your arguments, and we'll hear rebuttal. Thank you, Your Honors. Just a few points in rebuttal. I'll start with very specific points and then maybe get a little broader, but I just wanted to be clear, Judge Mathis, you asked about where we preserved the Grupo Mexicano argument below. It was principally in the motion to dismiss briefing where it's at pages 16 and 17, and then it was rejected there, but Judge Sargas rejected it largely by shifting the topic to medical monitoring and suggesting that, you know, that was different, but he really didn't ever squarely address the argument that the science panel, which is the principal relief that the complaint seeks. Just on that point, if I may, I mean, what's your answer to Mr. Herzig's point that he made just now that, you know, if the presence of this stuff in his client's bloodstream is itself an injury just hypothetically, that the panel redresses that by allowing us to understand what that harm is and have a more precise understanding of, you know, what the harm is? I mean, you know. I think that's kind of non-responsive and therefore, which is to say it's not actually redressing the physical injury, and I think, you know, Judge Thapar, when he gave me a hypo, I think correctly sort of moved the thing to thinking, well, I have it and I have emotional distress, and like I can maybe see an argument that the science panel somehow addresses the emotional distress, but it doesn't really address, redress the battery, and of course, you know, the normal. Medical monitoring in the traditional sense to tell you when you are about to get cancer? I'm just assuming that at this level would at some point create cancer, but. Of course, you're assuming what the science panel is going to tell him. Right, but I'm getting rid of the science. Like, if you had just pure medical monitoring, would that handle your problem? I think the redressability problem would be less obvious with respect to medical monitoring than the science panel. But I think the medical monitoring has sort of problems of its own, including that's, to me, in my mind, the most obviously sort of not indivisible relief here because, you know, even my friend, when he was describing that in a very abstract way, which I don't think is sufficient enough for the certification stage, but even he said, well, there will be a menu of options. Excuse me, I assume right there, it's already, you know, it's already divisible because you're at different places of the menu. If the C8 panel is any guide, the menu option for a bunch of people is going to be no monitoring because, you know, to the extent you have a condition or something, it's not something that we find even remotely satisfied or associated with your condition. So you don't need any additional. What about this argument that it's too early now and it's going to be too late later? Well, it's too early now. You know, I don't think, like, you know, we'll get to too late later. I'm not going to sort of give up a statute of limitations problem on behalf of my client. But I think particularly if we succeed and this panel holds that it's too early, I think that's going to be a problem for us in arguing that it's too late at some later junction. But maybe I'll stay on that for a second, which is it is radically too early at this point. I mean, this would be the equivalent of walking in at the very beginning of the asbestos litigation or the very beginning of the tobacco litigation and saying, boy, you know, I don't think the Surgeon General is doing a very good job with this, studying these cigarettes. I think there's a real problem with asbestos, but I'm not really sure. So I want to convene a science panel. Nobody would have given that relief at that time. It would have been unheard of in equity at that time. And it frankly would have distorted all of the subsequent litigation. And one way to think about this, and Judge Keflick, you know, came, you know, essentially came close to saying this, but, you know, one way to understand this is they just want us to pay for their expert discovery to bring a later suit against us. And I just don't know kind of where they get to shift the cost in that way. And certainly there's nothing like that that has any origins. Their argument is you put this in their body. You created it. You put it in their body, so you should pay the cost. I mean, that at its simplest, barest form is their argument. But, you know, but even at that level, it's not like all of these defendants are not the ones that necessarily put it in his body. And it's not the, they didn't put it necessarily in every member of the class. And really at a fundamental problem, at a fundamental level, the problem here really is. As you can see, though, this is different than the hypothetical of three shooters. In other words, if 50 people put it in my body, 50 companies, and I sue 10, that's not a problem. Yes, it is. Why? I don't have to sue all 50 if 10 put it in my body. If I know the 10 that put it in my body, yes. But if I just know that one of the 50 put it in my body and I'm going to sue 10, that doesn't get it done at the common law. That doesn't get it done at Article 3. And if I could just finish with the point about the Rules Enabling Act. If this were brought, I mean, the whole way the Rules Enabling Act and class actions are supposed to work is I'm supposed to bring a suit conceptually as an individual. And then at the end of it, I'm going to be like, whoa, gee whiz. Like, I could actually bring this on behalf of the whole class, and it would be a lot more efficient. This fundamentally violates that paradigm. If Mr. Hardwick were going to bring a suit, he'd start with the people that put the foam that he used, and he would sue that defendant, and he would get relief that was specific to him. Lots of people are bringing actions like that right now against some of the defendants. But this is just an effort to just transmogrify that individual suit into something that looks nothing like the relief in that individual suit, projects to the whole class, and in order to get there, it has to define the injury down to mere exposure, and then it has to ask for this relief that has no kind of analogs to what a court of chancery would have granted in 1789. Thank you, Your Honor. Any questions? All right. Thank you both for your arguments. Case will be submitted.